**Certiorari Denied, January 19, 2011, No. 32,774**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-018**

**Filing Date: November 22, 2010**

**Docket No. 28,607**

**STATE OF NEW MEXICO,**

 **Plaintiff-Appellee,**

**v.**

**ELIZAR URRUTIA QUIÑONES,**

 **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Will O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**FRY, Chief Judge.**

**{1}** Defendant appeals his felony convictions for one count of intentional child abuse resulting in death and two counts of intentional child abuse resulting in great bodily harm, contrary to NMSA 1978, Section 30-6-1(D) (2004) (amended 2005 and 2009). We conclude that: (1) the district court properly denied Defendant's motion to suppress an incriminating statement he made to detectives, (2) the district court did not abuse its discretion on two

1

evidentiary rulings, (3) Defendant has not established a prima facie case for ineffective assistance of counsel, (4) there was substantial evidence supporting Defendant's convictions for intentional child abuse, and (5) there was no cumulative error. We therefore affirm.

## BACKGROUND

**{2}** Defendant's convictions stem from the death of his daughter, Diana, following an incident that arose on January 11, 2005, when Diana was approximately six weeks old. Defendant was allegedly changing Diana's diaper after having fed her when he noticed that she was unresponsive and had stopped breathing. Emergency personnel responded to Defendant's 911 call, and Diana was later air-lifted to a hospital in Albuquerque, New Mexico, where her treating physicians concluded that she was brain dead after having suffered extensive brain injuries. Diana's other injuries included bucket-handle fractures of both femurs and several rib fractures, which her physicians determined were older injuries at various stages of healing. Diana died four days later as a result of her brain injuries. The State's experts opined at trial that Diana was a victim of shaken baby syndrome and that her injuries were the result of child abuse.

**{3}** On January 12, 2005, while Diana was still being treated at the hospital, detectives questioned Defendant and his wife regarding Diana's injuries, and Defendant stated that he had previously injured Diana on three separate occasions. Shortly thereafter, Defendant was arrested and indicted on three counts of intentional child abuse, contrary to Section 30-6-1(D). Defendant was tried twice; his first trial resulted in a mistrial after the jury was unable to agree on a verdict on all three counts. At his second trial, Defendant was convicted on all counts. Pursuant to New Mexico's habitual offender statute, NMSA 1978, Section 31-18-17 (2003), the district court sentenced Defendant to a total of 27 years in prison followed by two years' parole. This appeal followed.

## DISCUSSION

**{4}** Defendant raises six issues on appeal. He argues that: (1) the district court erred in refusing to suppress Defendant's incriminating statement, (2) the district court erred in denying Defendant an opportunity to elicit testimony that his interrogator did not supply Defendant with an attorney during his interrogation, (3) the district court erred in denying Defendant an opportunity to elicit testimony at trial about his non-violent character, (4) Defendant was denied effective assistance of counsel because his attorney failed to consult with or retain a defense expert on shaken baby syndrome, (5) there was insufficient evidence to support Defendant's convictions, and (6) cumulative error deprived Defendant of a fair trial. We address each issue in turn below.

### 1.    Suppression of Defendant's Incriminating Statement

**{5}** Defendant first contends that the district court erred in denying his motion to suppress the incriminating statement he made during the second of his two encounters with

Detective Sheila Cunningham on the evening of January 12, 2005. Specifically, Defendant argues that his statement should have been suppressed for three reasons: (1) he did not knowingly and intelligently waive his previously invoked Fifth Amendment right to counsel before he gave the incriminating statement during his second encounter, (2) his statement was involuntarily given, and (3) the New Mexico Constitution requires that interrogators supply an attorney once a defendant has invoked his right to counsel.

**{6}** We begin by stating the facts surrounding the events of Defendant's interrogation. It is undisputed that at the request of Detective Cunningham, Defendant and his wife accompanied Detectives Cunningham and Larry Tafoya from the hospital to the police station on the evening of January 12, 2005. Defendant and his wife were placed in separate interview rooms, and Defendant was questioned by Detective Cunningham. Before the questioning began, Defendant was given *Miranda* warnings in full, and he signed a waiver of rights form. After Detective Cunningham had questioned Defendant for some time regarding the serious nature of Diana's injuries and the events preceding Defendant's 911 call, Defendant unequivocally asserted his right to counsel. At this point, Detective Cunningham ceased the interrogation and left the room.

**{7}** After being left alone in the interview room for approximately one hour, Defendant knocked on the door and asked to speak with Detective Cunningham again because he wanted to "take the blame for it." When Detective Cunningham re-entered the room, Defendant informed her that he had changed his mind about wanting an attorney because of his wife and because he was tired. He then proceeded to incriminate himself, stating that: (1) two days earlier, he had squeezed Diana's head "hard enough to hurt her"; (2) two weeks earlier, he had held Diana tightly and squeezed hard enough to break her ribs; and (3) some time ago, he held Diana's legs too tightly while changing her diaper and then heard her legs pop. Before his first trial, Defendant filed a motion to suppress this incriminating statement, which the district court denied.

**{8}** A ruling on a motion to suppress evidence presents a mixed question of law and fact. *State v. Garcia*, 2005-NMSC-017, ¶ 27, 138 N.M. 1, 116 P.3d 72. On appeal, we "review[] factual findings under a substantial evidence standard, viewing the facts in the light most favorable to the prevailing party, and we review de novo whether the district court correctly applied the law to the facts." *State v. Slayton*, 2009-NMSC-054, ¶ 11, 147 N.M. 340, 223 P.3d 337. Whether a defendant has validly waived his/her previously invoked right to counsel and whether a confession is voluntarily given are legal determinations that we review de novo on appeal. *See State v. Barrera*, 2001-NMSC-014, ¶ 23, 130 N.M. 227, 22 P.3d 1177 (applying de novo review to whether the defendant waived his *Miranda* rights); *State v. Salazar*, 1997-NMSC-044, ¶ 59, 123 N.M. 778, 945 P.2d 996 (applying de novo review to whether a confession is voluntary).

**{9}** Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), in order to protect a defendant's right against self-incrimination, interrogators are required to inform a suspect, before beginning questioning: (1) of the right to remain silent, (2) of the prospect that any

statement made may be used as evidence against him/her, and (3) of the right to an attorney during an interrogation. *Id.* at 444. However, any of these rights may be waived, "provided [that] the waiver is made voluntarily, knowingly and intelligently." *Id.* When a defendant moves to suppress statements allegedly made in violation of *Miranda*, "the [s]tate bears the burden of demonstrating by a preponderance of the evidence that the defendant" made a voluntary, knowing, and intelligent waiver. *State v. Martinez*, 1999-NMSC-018, ¶ 14, 127 N.M. 207, 979 P.2d 718. In doing so, "[t]he [s]tate must demonstrate that the waiver of rights was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and also must show that the waiver "was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). We review whether such a waiver was made by evaluating "the totality of the circumstances and the particular facts, including consideration of the mental and physical condition, background, experience, and conduct of the accused, as well as the conduct of the police." *Id.* (internal quotation marks and citation omitted). Additionally, we must indulge every reasonable presumption against waiver. *Id.*

**a.       Defendant's Waiver of Previously Invoked Right to Counsel**

**{10}**     Defendant argues that he did not waive his previously invoked *Miranda* right to counsel due to the "circumstances of [his] confinement" and the fact that the State did not "actually produc[e] an attorney" after he invoked his right to counsel during the first encounter with Detective Cunningham. In *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), the United States Supreme Court established the general rule regarding further questioning after an accused has asserted his Fifth Amendment right to counsel. "[W]hen an accused has invoked his right to have counsel present during [a] custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484; *see State v. Bailey*, 2008-NMCA-084, ¶ 9, 144 N.M. 279, 186 P.3d 908. The Court held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." *Edwards*, 451 U.S. at 484-85 (emphasis added). The Court went on to note that "a valid waiver of an accused's previously invoked Fifth Amendment right to counsel is possible" if the "waiver was knowing and intelligent . . . under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 486, n.9; *see State v. Boeglin*, 100 N.M. 127, 131-32, 666 P.2d 1274, 1278-79 (Ct. App. 1983); *see also State v. Post*, 109 N.M. 177, 179-80, 783 P.2d 487, 489-90 (Ct. App. 1989).

**{11}**     In the present case, Defendant does not dispute that Detective Cunningham stopped questioning him and left the interrogation room after he invoked his right to counsel and that sometime later, Defendant knocked on the door to the interrogation room and asked to speak with her again. Under *Edwards*, we conclude that Defendant himself re-initiated contact with Detective Cunningham and expressed his desire to speak with her again. We also note

4

that both Detective Kennedy, who was observing Defendant from outside the interview room, and Detective Cunningham reminded Defendant that he had invoked his right to counsel. Despite this reminder, Defendant voluntarily continued his second encounter with Detective Cunningham. We see nothing in the circumstances of Defendant's confinement indicating that Defendant's re-initiation of police contact was the result of any official coercion or pressure. Therefore, we conclude that Defendant willingly and freely made a choice to waive his previously invoked right to counsel. *See Salazar*, 1997-NMSC-044, ¶¶ 10, 63 (holding that the defendant knowingly and intelligently waived his previously invoked right to counsel when he re-initiated contact with the police by asking them to return to his hospital room so he could "tell his side of the story" and by not objecting when the police actually returned to the room and again advised him of his *Miranda* rights (internal quotation marks omitted)); *cf. Post*, 109 N.M. at 179-80, 783 P.2d at 489-90 (holding that the defendant's incriminating statement should have been suppressed because detectives continued questioning the defendant after he invoked his right to counsel and without any re-initiation of contact by the defendant).

**{12}** Defendant next argues that his incriminating statement should have been suppressed because Detective Cunningham failed to re-read him *Miranda* warnings when she re-entered the interview room at his request. Defendant relies on *State v. Greene*, 91 N.M. 207, 572 P.2d 935 (1977), and *Salazar* in asserting that officers are required to provide new and adequate *Miranda* warnings when a suspect initiates contact with officers after having previously invoked his/her right to counsel. Although we recognize that in certain circumstances officers have re-Mirandized suspects during subsequent interrogations, this Court has never adopted a per se rule requiring officers to do so. *See State v. Gilbert*, 98 N.M. 530, 533, 650 P.2d 814, 818 (1982) (stating that "[a] confession is not necessarily invalid because warnings as to the right to remain silent and to counsel were not given in full each time the interrogation process was resumed after interruption"). Instead, we believe the critical inquiry is whether a suspect is still aware of the rights afforded to him under *Miranda* when he resumes contact with officers. This can occur even in the absence of a new set of *Miranda* warnings. *See id.* (concluding that a new set of *Miranda* warnings was not required at the start of a second encounter between the defendant and officers where *Miranda* warnings had been read a few hours earlier to the defendant on an unrelated charge and the defendant had once before invoked his right to counsel and officers had complied).

**{13}** We conclude that Defendant was still aware of his constitutional rights under *Miranda* when he re-initiated contact with Detective Cunningham. Only a few hours had passed from the time Defendant was first read his *Miranda* rights and his second encounter. He was given complete *Miranda* warnings at the start of his first encounter with Detective Cunningham, and at that time, he verbally indicated that he understood what his rights were and then he signed the initial waiver of rights form. More importantly, he had previously invoked his right to counsel and was aware that Detective Cunningham had honored his request by immediately ceasing the first interrogation. *See Salazar*, 1997-NMSC-044, ¶¶ 10, 61 (determining that the defendant understood what his *Miranda* rights were because he had previously successfully invoked his right to counsel during an earlier encounter with law

5

enforcement). In addition, the detectives reminded Defendant that he had previously invoked his right to counsel before they allowed him to voluntarily continue with any further statements.

## b. Voluntariness of Statement

**{14}** Defendant also challenges the State's proof of the voluntariness of his statement. We stated the general rule regarding voluntariness of a confession in *State v. Lobato*, 2006-NMCA-051, ¶ 9, 139 N.M. 431, 134 P.3d 122.

> A confession is involuntary only if official coercion has occurred. Official coercion occurs when a defendant's will has been overborne and his capacity for self-determination [has been] critically impaired. If, however, the confession is the product of an essentially free and unconstrained choice by its maker, it may be used against the defendant without offending due process. On appeal, we review the totality of the circumstances to determine as a threshold matter of law whether the [s]tate has proved by a preponderance of the evidence that [the d]efendant's confession was voluntary.

*Id.* (first alteration in original) (internal quotation marks and citations omitted).

**{15}** Defendant contends that his confession was not voluntarily given because he was held in isolation for one-and-a-half hours, separated from his wife and not allowed to communicate with her, and because he was told that "his fate . . . depended [on] communications with the police in Las Cruces." We are not persuaded. Defendant fails to provide record support for the length of time he was allegedly held in isolation. *See State v. Garcia*, 2009-NMCA-107, ¶ 23, 147 N.M. 150, 217 P.3d 1048 (stating that we do not consider arguments if the defendant fails to cite record support). We note that during the time interval between both encounters, Defendant was able to leave the interview room to use the restroom, and he twice asked for and received status updates from Detective Kennedy. As for the inability to communicate with his wife, Detective Kennedy testified that Defendant and his wife shouted back and forth between their respective interview rooms and that they could hear each other. Finally, Defendant does not demonstrate that any threats or coercive activity occurred on the part of Detectives Cunningham and Kennedy when they informed him that Las Cruces police would make the next decision regarding his interview after he invoked his right to counsel. We note that Defendant was aware from the beginning of his interview that the Las Cruces police department was involved and had made the initial request that Detective Cunningham interview Defendant while he was in Albuquerque. Consequently, because none of the interview circumstances that Defendant refers to demonstrate official coercion, we conclude that Defendant's statement was voluntarily given. *See State v. Muñoz*, 1998-NMSC-048, ¶ 23, 126 N.M. 535, 972 P.2d 847 (explaining that this Court "determine[s] as a threshold matter of law that the prosecution proved voluntariness by a preponderance of the evidence").

6

## c.    State Constitution

**{16}**    Defendant also argues that the New Mexico Constitution affords him greater protection than the federal constitution.  Specifically, Defendant argues that under the New Mexico Constitution, interrogators have an obligation to "supply an attorney" once a defendant has invoked his Fifth Amendment right to counsel.  As Defendant acknowledges, no such obligation exists under federal law.  *See, e.g.*, *Miranda*, 384 U.S. at 474 ("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. . . .  This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners"); *see also Edwards*, 451 U.S. at 482, 485 (reiterating that officers have an obligation to cease an interrogation once a suspect invokes his right to have counsel present during custodial interrogation).

**{17}**    "Under our interstitial approach to interpreting the New Mexico Constitution, we may diverge from federal precedent where the federal analysis is flawed, where there are structural differences between the state and federal governments, or because of distinctive New Mexico characteristics."  *State v. Garcia*, 2009-NMSC-046, ¶ 27, 147 N.M. 134, 217 P.3d 1032.  We conclude that Defendant has not presented any arguments on appeal that are directed toward any of these three procedural reasons.  Though Defendant makes a blanket assertion that federal law on this issue "does not go far enough in protecting a suspect's right to due process of law," he provides us with no specific argument as to why the existing federal analysis is flawed.  Defendant also does not argue that there are any structural differences between our state and the federal government or that distinctive New Mexico characteristics would militate in favor of greater protections under our state constitution.

**{18}**    To the extent that Defendant cites existing New Mexico precedent on this issue, we remain unpersuaded because neither *State v. Rascon*, 89 N.M. 254, 550 P.2d 266 (1976), *State v. Foster*, 1998-NMCA-163, 126 N.M. 177, 967 P.2d 852, nor *State v. Seward*, 104 N.M. 548, 724 P.2d 756 (Ct. App. 1986), held that the New Mexico Constitution's counterpart to the fifth amendment of the federal constitution affords greater protection to suspects who invoke a right to counsel during an interrogation.  *See Rascon*, 89 N.M. at 258, 260, 550 P.2d at 270, 272 (holding that the New Mexico's Public Defender Act, NMSA 1978, Sections 31-15-1 to -12 (1973, as amended through 2001), does not create a statutory extension or expansion of a detained individual's constitutional right to counsel under either the federal or New Mexico Constitutions and also stating, in relevant part, that a suspect's fifth amendment rights during an interrogation are not greater under the parallel provision of the New Mexico Constitution)*; see also Foster*, 1998-NMCA-163, ¶¶ 13-19 (holding that evidence of a defendant's failure to mention in initial police interviews the threats made on the day of the shooting had significant probative value as impeachment, was admissible as a matter of New Mexico evidentiary law, and such impeachment did not deny the defendant due process under *Miranda*); *Seward*, 104 N.M. at 554, 724 P.2d at 762 (holding that the New Mexico's Public Defender Act and the Indigent Defense Act, NMSA 1978, Sections

7

31-16-1 to -10 (1968, as amended through 1973), establish only mechanisms for indigents to obtain counsel in criminal proceedings and that "[i]t is not within the [L]egislature's purview to establish or regulate constitutional or judicial procedural rights [to counsel] through these Acts"). Accordingly, Defendant has not persuaded us that we have any basis to depart from existing federal law.

## 2. District Court's Evidentiary Rulings

{19}    Defendant next challenges two of the district court's evidentiary rulings, arguing that the district court erred in: (1) refusing to allow Defendant to ask Detective Cunningham whether she supplied Defendant with an attorney during the interrogation; and (2) denying Defendant an opportunity to elicit testimony from his relatives regarding his non-violent character. "Generally speaking, a reviewing court defers to the [district] court's decision to admit or exclude evidence and will not reverse unless there has been an abuse of discretion. However, our review of the application of the law to the facts is conducted de novo." *State v. Martinez*, 2008-NMSC-060, ¶ 10, 145 N.M. 220, 195 P.3d 1232 (internal quotation marks and citation omitted). "We cannot say the [district] court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted).

### a. Detective Cunningham's Testimony

{20}    Defendant first contends that the district court abused its discretion when it refused to allow him to ask Detective Cunningham during cross-examination whether she "ma[de] an attorney available to him" following his request for counsel during the interrogation. Defendant argues that he should have been allowed to pursue this line of questioning with Detective Cunningham because it was relevant to the issue of the voluntariness of Defendant's incriminating statement. At trial, the district court told defense counsel that he could inquire about the voluntariness of the statement, but that asking Detective Cunningham whether she made an attorney available to Defendant was "the same thing as implying they [i.e., police officers] ha[d] a duty to make a lawyer available to [Defendant]."

{21}    We agree with Defendant that the voluntariness of his incriminating statement was at issue. However, to the extent that we understand Defendant's argument, we are not persuaded that the district court abused its discretion on this evidentiary ruling. The district court understood the law with respect to an officer's duties during an interrogation and the law regarding the voluntariness of a statement obtained after a defendant has waived his right to counsel. *Cf. State v. Elinski*, 1997-NMCA-117, ¶ 8, 124 N.M. 261, 948 P.2d 1209 (stating that a trial court abuses its discretion when it exercises its discretion based on a misunderstanding of the law). The State is not obligated to furnish counsel when, as happened in this case, officers cease an interrogation because a defendant has asserted his fifth amendment right to counsel. *See Rascon*, 89 N.M. at 258, 550 P.2d at 270 (stating that if a defendant asserts his right to counsel during an interrogation, officers "may elect to

question the suspect no further, in which event the [s]tate is under no obligation to provide counsel at that point in response to fifth amendment rights"). Thus, we conclude the district court correctly applied the law to the facts when it sustained the State's objection to defense counsel's question to Detective Cunningham.

**b.      Character Evidence**

**{22}**      Defendant also claims that the district court abused its discretion when it refused to allow him to elicit testimony from his family members about his non-violent character. Specifically, Defendant argues that the district court erred when it refused to allow defense counsel to ask one of the defense witnesses whether she knew if Defendant had "ever act[ed] violently towards anyone." The State argues that Defendant failed to preserve this issue for appeal because defense counsel withdrew the question after the State's objection to the question and later, defense counsel approved the district court's limiting instruction on the question.

**{23}**      In order to preserve an issue for appeal, Defendant must make a timely objection that specifically apprises the district court of the nature of the claimed error and invokes an intelligent ruling thereon. *State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280. "Both the district court and the [s]tate must be alerted to the specific claim of error in order to allow the [s]tate a fair opportunity to respond, to show the district court why it should not rule in [the d]efendant's favor, and to allow the district court the opportunity to correct any mistake." *State v. Maez*, 2009-NMCA-108, ¶ 14, 147 N.M. 91, 217 P.3d 104. Preservation serves the purposes of (1) allowing the trial court an opportunity to correct any errors, thereby avoiding the need for appeal; and (2) creating a record from which this Court can make informed decisions. *See, e.g.*, *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 38, 125 N.M. 748, 965 P.2d 332.

**{24}**      On this issue, Defendant's brief refers to events from the first trial. Our review of the record on this issue, however, is limited only to the testimony from Defendant's second trial, which is the trial that resulted in his convictions. The transcript of the second trial reveals that immediately after defense counsel asked Defendant's sister-in-law whether Defendant had ever acted violently toward anyone, the State objected to the question on relevancy grounds. The following exchange then took place between the parties and the district court:

| [C]ourt:   | [To defense counsel:]  [W]hat's the relevancy of that question? |
| --- | --- |
| [Defense]: | Propensity for violence. |
| [State]:   | May we approach? |
| [Defense]: | Withdraw[n]. |
| [C]ourt:   | Objection sustained. |

Defense counsel then abandoned this line of questioning. Because Defendant withdrew his question without alerting the district court and the State to any argument that the question

would have elicited proper character evidence under Rule 11-404(A)(1) NMRA, Defendant failed to provide the district court with a factual or legal basis on which to make an informed ruling that we can review on appeal. *State v. Frazier*, 2007-NMSC-032, ¶ 38, 142 N.M. 120, 164 P.3d 1 ("A party cannot rely on a withdrawn objection to preserve error." (alteration omitted) (internal quotation marks and citation omitted)).

**{25}** In addition, after defense counsel finished questioning the defense witness, the State asked for a limiting instruction on the withdrawn question. Again, defense counsel did not raise any objection to the State's request, and he affirmatively stated that he agreed with the district court's proposed limiting instruction. *Cordova v. Taos Ski Valley, Inc.*, 121 N.M. 258, 263, 910 P.2d 334, 339 (Ct. App. 1995) ("A party who has contributed, at least in part, to perceived shortcomings in a [district] court's ruling should hardly be heard to complain about those shortcomings on appeal.").

**{26}** Because we conclude that the issue was not preserved for appeal, we decline to address the parties' arguments as to the merits of Defendant's attempt to elicit character evidence on his non-violent nature pursuant to Rule 11-404 and Rule 11-405 NMRA.

### 3.    Ineffective Assistance of Counsel

**{27}** Defendant argues that he was denied effective assistance of counsel because his trial attorney failed to consult with, retain, or present the testimony of an expert witness on shaken baby syndrome. Defendant contends that the "results of th[e] trial would likely have been different if defense counsel had called or consulted with an expert" and accordingly, he seeks reversal of his convictions or, in the alternative, remand to the district court for an evidentiary hearing on defense counsel's effectiveness.

**{28}** We review claims of ineffective assistance of counsel de novo. *State v. Boergadine*, 2005-NMCA-028, ¶ 33, 137 N.M. 92, 107 P.3d 532. "To establish a prima facie case of ineffective assistance of counsel, [the d]efendant must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) that [the d]efendant suffered prejudice in that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Aker*, 2005-NMCA-063, ¶ 34, 137 N.M. 561, 113 P.3d 384 (internal quotation marks and citation omitted).

**{29}** To show deficient performance, Defendant must overcome the presumption that counsel's conduct was within "the wide range of reasonable professional assistance." *State v. Dylan J.*, 2009-NMCA-027, ¶ 37, 145 N.M. 719, 204 P.3d 44 (internal quotation marks and citation omitted). If we "can conceive of a reasonable trial tactic which would explain the counsel's performance, we [should] not find ineffective assistance." *Id.* ¶ 39 (internal quotation marks and citation omitted).

10

**{30}**     A defendant must also affirmatively prove prejudice. *See State v. Dietrich*, 2009-NMCA-031, ¶ 84, 145 N.M. 733, 204 P.3d 748, *cert. denied*, 2009-NMCERT-002, 145 N.M. 704, 204 P.3d 29. "[M]ere evidentiary prejudice is not enough. Counsel's deficient performance must represent so serious a failure of the adversarial process that it undermines judicial confidence in the accuracy and reliability of the outcome." *State v. Roybal*, 2002-NMSC-027, ¶ 25, 132 N.M. 657, 54 P.3d 61.

**{31}**     If a prima facie showing of ineffective assistance is made, the Court may remand the case for an evidentiary hearing if unusual circumstances exist. *Dylan J.*, 2009-NMCA-027, ¶ 41. Our Supreme Court has expressed a preference for ineffective assistance of counsel claims to be heard in habeas corpus proceedings when the trial record does not contain sufficient evidence to allow for such a determination on direct appeal. *Id.*

**{32}**     Defendant argues that because expert testimony is an essential component of cases involving shaken baby syndrome, his attorney's failure to consult with or present a defense expert at trial prevented him from challenging the State's theory of the case. Defendant asserts that a defense expert *could have* countered the State's assertions that Defendant inflicted the injuries to his daughter, that the injuries were sustained immediately, and that the injuries were indicative of shaken baby syndrome. Defendant acknowledges, however, that the record reveals only that his trial attorney did not present expert testimony at trial but does not "disclose what efforts, if any, counsel made behind the scenes" with respect to consulting with or retaining a defense expert.

**{33}**     We agree with Defendant's characterization of the trial record and conclude that the evidence before us is not sufficient to allow us to determine whether defense counsel's performance was deficient, and if so, whether Defendant was prejudiced as a result. On the basis of the record before us, we are not persuaded that Defendant has established a prima facie case of ineffectiveness. We cannot state with certainty that Defendant's trial counsel did not retain or consult with a medical expert on shaken baby syndrome. Although the record indicates that at some point during the pre-trial proceedings, defense counsel made unsuccessful attempts to interview and consult with experts, it is unclear whether Defendant's attorney had subsequent success in this endeavor. There is also no information in the record regarding defense counsel's efforts with respect to any potential defense experts during the time period between the first and second trials. On this record, we will not speculate as to what happened behind the scenes with respect to defense counsel's decisions regarding potential defense experts. *See Dylan J.*, 2009-NMCA-027, ¶ 40 ("We are reluctant to attempt to decide the issue [of trial counsel's effectiveness] when we do not have before us all of the facts needed for an informed decision.").

**{34}**     We note that our Supreme Court has "expressly rejected the contention that the failure to introduce the testimony of an expert witness constitutes ineffective assistance of counsel per se." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 44, 130 N.M. 198, 22 P.3d 666. We have generally required a defendant to show that a defense expert was actually available to testify in support of the defense's theory at trial. *See State v. Aragon*, 2009-NMCA-102, ¶

20, 147 N.M. 26, 216 P.3d 276 ("[W]e have required a defendant to show that an expert would have been—not could have been—available to testify at trial [for a prima facie case of ineffectiveness].").  Apart from Defendant's appellate counsel's conjectures regarding what a defense expert could have testified to in this case, there is nothing in the record to indicate that a defense expert was actually available to testify in support of Defendant at trial and what the content of the expert's testimony would have been.  *See State v. Crain*, 1997-NMCA-101, ¶ 33, 124 N.M. 84, 946 P.2d 1095 (concluding that the defendant had not made a prima facie case because the record failed to establish that a defense expert was available to testify in support of the defendant's theory of the case).

**{35}**    Defendant's reliance on *Aragon* is misplaced because that case is factually distinguishable from the factual record in this case.  In *Aragon*, we concluded that the defendant in a child abuse case had demonstrated a prima facie case of ineffectiveness due to his trial counsel's "failure to engage an expert for consultation, combined with her failure to conduct adequate pre-trial interviews of the [s]tate's experts."  2009-NMCA-102, ¶ 15.  Here, we are not certain that Defendant's trial counsel did *not* consult with an expert or conduct pre-trial interviews.  Moreover, in *Aragon*, we concluded that expert testimony was the "crux" of the case.  *Id.* ¶ 12.  In this case, however, the State did not rely exclusively on expert testimony to form the basis of its case; it also had Defendant's incriminating statements and Diana's autopsy results that it presented to the jury.  Finally, in *Aragon*, there was evidence that the defense theory had some support within the medical community, thereby establishing that an expert could have been available to bolster the defense's case. *Id.* ¶ 20.  In this case, there is no indication in the evidence from either trial that there was any medical evidence supporting Defendant's theories of the case.

**{36}**    Thus, we conclude that Defendant has not demonstrated a prima facie case of ineffectiveness.  We clarify, however, that our determination does not preclude Defendant from pursuing these arguments in a collateral proceeding for habeas corpus relief, where he can develop a proper record.  *See State v. Bernal*, 2006-NMSC-050, ¶ 36, 140 N.M. 644, 146 P.3d 289.

### 4.        Sufficiency of the Evidence

**{37}**    We next address Defendant's contention that there was insufficient evidence presented at trial to support his convictions for intentional child abuse.  "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.  The relevant inquiry is "whether direct or circumstantial substantial evidence exists and supports a verdict of guilt beyond a reasonable doubt with respect to every element essential for conviction.  We determine whether a rational fact[]finder could have found that each element of the crime was established beyond a reasonable doubt." *State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86 (citations omitted).

12

**{38}** The sufficiency of the evidence is assessed against the jury instructions because they become the law of the case. *State v. Smith*, 104 N.M. 729, 730, 726 P.2d 883, 884 (Ct. App. 1986). In order for the jury to find Defendant guilty of count one, child abuse resulting in death or great bodily harm, the jury was required to find the following elements beyond a reasonable doubt: (1) Defendant caused Diana to be placed in a situation which endangered Diana's life or health, or Defendant tortured or cruelly punished Diana; (2) Defendant acted intentionally or with reckless disregard; (3) Defendant's actions or failure to act resulted in Diana's death; (4) Diana was under the age of 18; and (5) this happened in New Mexico on or about January 11, 2005. In order to find Defendant guilty of counts two and three, child abuse which did not result in death or great bodily harm, the jury was required to find the following elements beyond a reasonable doubt: (1) Defendant caused Diana to be placed in a situation which endangered her life or health, or Defendant tortured or cruelly punished Diana by causing her femurs to be fractured *[count 2]* or by causing her ribs to be fractured *[count 3]*; (2) Defendant acted intentionally or with reckless disregard; (3) Diana was under the age of 18; and (4) this happened in New Mexico on or between December 4, 2004, and January 10, 2005.

**{39}** We conclude that there was sufficient evidence to support the jury's verdict as to all three counts. Defendant's wife testified at trial that Defendant was the last person with Diana before Diana stopped responding and went into respiratory distress on the evening of January 11, 2005. The State presented extensive medical testimony from Diana's treating physicians as to the nature of her injuries after she was transported by emergency personnel to the hospital. Dr. Crowley, Diana's treating physician, testified that Diana's injuries included a traumatic brain injury, rib fractures, and bucket-handle fractures of both of her femurs; that her rib and femur fractures were at different stages of healing; and that she stopped breathing within minutes of suffering the traumatic brain injury. Dr. Crowley testified that Diana's injuries were consistent with child abuse. Additionally, the State presented Diana's autopsy results, which had concluded that the manner of Diana's death was homicide and that Diana had suffered a rapid acceleration-deceleration injury consistent with "shaken impact syndrome." Dr. Paul, the pathologist who performed Diana's autopsy, opined that Diana "died of multiple blunt force injuries, . . . head injuries, rib fractures, and femur fractures as a result of child abuse." The State also presented photographic evidence of Diana's injuries. Moreover, the State presented the testimony of Detective Cunningham, who testified regarding the incriminating statements Defendant made during his interrogation. Defendant told Detective Cunningham that he had picked Diana up and squeezed her "[h]ard enough to hurt her" a couple of weeks before she died. He admitted to pulling Diana's legs while changing her diaper and hearing them pop a few weeks before her death. He also admitted that he had squeezed Diana's head on the morning of January 11. Viewing the evidence in the light most favorable to the verdicts, we conclude that a reasonable jury could have found that Defendant committed intentional child abuse.

**{40}** On appeal, Defendant re-asserts his innocence and contends that the State's own experts testified that Defendant's acts of squeezing Diana while hugging her and squeezing her head did not cause her fatal injuries. However, "[o]n appeal, we will not reweigh the

13

evidence nor substitute our judgment for that of the fact[]finder provided that there is sufficient evidence to support the verdict." *State v. Collins*, 2007-NMCA-106, ¶ 29, 142 N.M. 419, 166 P.3d 480. The jury was free to disregard the allegedly contrary expert testimony that Defendant claims supports his innocence. *Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts.").

## 5.       Cumulative Error

**{41}**    Lastly, Defendant argues that cumulative error deprived him of a fair trial. The cumulative error doctrine calls for reversal of a conviction "when the cumulative impact of the errors that occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *See Bailey*, 2008-NMCA-084, ¶ 26 (alteration omitted). The cumulative error doctrine is strictly applied and may not be successfully invoked if the record as a whole demonstrates that the defendant received a fair trial. *State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814. When we find that no error occurred, "there is no cumulative error." *State v. Aragon*, 1999-NMCA-060, ¶ 19, 127 N.M. 393, 981 P.2d 1211. Because we have rejected Defendant's assertions of error in the proceedings before the district court, we conclude that the doctrine of cumulative error does not apply in the present case.

## CONCLUSION

**{42}**    For the foregoing reasons, we affirm Defendant's convictions.

**{43}    IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *State v. Quinones*, Docket No. 28,607**

| AE | APPEAL AND ERROR |
|---|---|
| AE-CE | Cumulative Error |
| AE-SB | Substantial or Sufficient Evidence |
| | |
| AT | ATTORNEYS |

| | |
|---|---|
| AT-EA | Effective Assistance of Counsel |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-MW | Miranda Warnings |
| CT-NM | New Mexico Constitution, General |
| CT-SL | Self-incrimination |
| CT-SU | Suppression of Evidence |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CN | Child Abuse and Neglect |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CF | Confession |
| CA-CE | Cumulative Error |
| CA-EA | Effective Assistance of Counsel |
| CA-EX | Expert Witness |
| CA-MW | Miranda Warnings |
| CA-ML | Motion in Limine |
| CA-MR | Motion to Suppress |
| CA-RA | Right Against Self-incrimination |
| CA-SI | Self-incrimination |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **EV** | **EVIDENCE** |
| EV-CE | Character Evidence |